UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES OF AMERICA

    -against-

TYQUAN MIDYETT,

                Defendant.

----------------------------------X

**MEMORANDUM & ORDER**
07-CR-874 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**


## I.    <u>BACKGROUND</u>

      Defendants Michael Brown and Tyquan Midyett are charged in a seventeen-count indictment with conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), possessing with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), and possessing with intent to distribute cocaine base in a school zone and in public housing facilities in violation of 21 U.S.C. § 860. Defendant Brown is also charged with using and carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c), and Midyett is charged with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

      Defendants moved jointly for suppression of evidence recovered during a January 9, 2007 police search of Brown's

apartment.  The court denied that motion in a separate Memorandum and Order on February 3, 2009.

The court now decides defendant Midyett's second motion to suppress evidence, in which he argues that he was arrested without probable cause on December 10, 2007 and that, as a result, the court should suppress $3,333 in cash and several cellular telephones that were recovered on his person subsequent to that arrest.  For reasons set forth below, Midyett's second motion to suppress is denied.


## II.   THE SUPPRESSION MOTION

### A.   Midyett's second motion

On November 20, 2008, Midyett filed an Affidavit ("Aff."), Notice of Motion, and Memorandum of Law ("Mem."), seeking, in relevant part, suppression of "$3,300 and several cell phones"  recovered from his person subsequent to his arrest on December 10, 2007.  (Doc. 176, Mem. at 2.)

Midyett's affidavit in support of his motion states that on December 10, 2007, he was walking near the Marcy Houses, a public housing project, at approximately 5:00 p.m. when police officers stopped, handcuffed, and searched him.  (Aff. ¶¶ 2-3.) The officers told Midyett they were looking for suspects in a

robbery. (Id. at 3.) Midyett saw police officers chasing several other people in the area. (Id. at 4.) Police officers removed "a sum of United States currency and some cell phones" from Midyett's person. (Id. at ¶ 5.) Midyett swears that he was not engaged in criminal activity before the police stopped him on December 10, 2007, and that the police recovered no weapons, drugs, or marked money from him. (Id. at 6.) Midyett argues that the police lacked probable cause to stop, arrest, and search him and therefore acted illegally in arresting him and searching him pursuant to the arrest. Midyett thus asserts that the evidence recovered during the search should be suppressed. (Mem. at 3.)

### B. Government opposition to Midyett's second motion

In a Memorandum of Law dated December 4, 2008 (Doc. 190, "Gov. Mem."), the government opposed Midyett's second motion to suppress, asserting that Midyett was arrested with probable cause on December 10, 2007 because, just before Midyett's arrest, an undercover officer of the New York Police Department ("NYPD") bought crack cocaine from Midyett and another individual, Jermaine Simmons, in the lobby of 101 Nostrand Avenue, Brooklyn, a building in the Marcy Houses

facility.  (Gov. Mem. at 5-6.)  The undercover officer informed his fellow officers of the drug purchase and gave a description of Midyett, who was stopped in the rear of another building, 113 Nostrand Avenue, located in the Marcy Houses, within ten minutes of the undercover purchase, and was positively identified by the undercover officer.  (Id. at 6.)

### C.   The Hearing

The court conducted a suppression hearing regarding Midyett's second motion to suppress evidence that the police recovered during his December 10, 2007 arrest.

The hearing relevant to Midyett's second motion was conducted on January 15-16, 2009.  The government presented testimony from NYPD Detective Susie Peralta, who works for Brooklyn North Narcotics and arrested Midyett on December 10, 2007, and the undercover police officer who testified that he bought drugs from Midyett on December 10, 2007 (Undercover #2521[1]).  Midyett did not call any witnesses.

---

[1]     The government moved to seal the courtroom during the undercover officer's testimony and to allow the undercover to testify under a pseudonym, Undercover #2521.  The parties briefed the issue of courtroom closure (see Doc. 210, Gov't Motion in Limine to Close Courtroom and Use Pseudonym; Doc. 218, Brown's Opposition; and Doc. 219, Midyett's Opposition.)  On January 15, 2009, at a closure hearing, the court addressed the issue of closure and made specific findings supporting the closing of the courtroom in order to take testimony as to whether there was a basis to close the courtroom during the

### 1.   *Detective Peralta*

Detective Peralta testified credibly as follows. Detective Peralta has worked for the NYPD for over 10 years, and has been assigned to Brooklyn North Narcotics for three years. (Tr.[2] 244.)  Her duties at Brooklyn North Narcotics include both long-term investigations and short-term investigations, also known as "buy and bust" operations.  (Tr. 244-245.)  When assigned as the arresting officer during a buy and bust operation, Detective Peralta processes any arrests, fills out pertinent paperwork, turns over property she finds to the NYPD

---

suppression hearing.  (Tr. 179-185.)  The defendants consented to the initial closure of the courtroom during the closure hearing, while the undercover officer testified as to the need for a closed courtroom during undercover's testimony at the suppression hearing.  (Tr. 178-180)  The defendants also consented to the undercover officer's use of his shield number, #2521, as a pseudonym during the closure hearing and the suppression hearing.  (Tr. 182-183, 185-186.)  At the closure hearing, during which the courtroom was closed, Undercover #2521 testified.  (Tr. 186-220.)  On the record, the court then made specific findings and, on the basis of those findings, granted the motion to close the courtroom to the public during the testimony of Undercover #2521 at the suppression hearing.  (Tr. 238-240.)  The court reserved decision on whether the courtroom could be closed during the trial if the undercover officer testified at that time.  (Tr. 238.)  The court permitted the undercover to testify at the suppression under the pseudonym Undercover #2521, and both defendants consented.  (Tr. 182-183, 185-186, 298-299.)  The courtroom was reopened during Detective Peralta's suppression hearing testimony, and then closed to the public while Undercover #2521 provided suppression hearing testimony.  Two members of Midyett's family who wished to be present during Undercover #2521's suppression hearing testimony were permitted, with no objection from the government, to remain in the courtroom during the closed portion of the suppression hearing.  (Tr. 180-181, 221-224, 227-238, 240-243, 297.)

[2]    References to the transcript of the hearing are indicated by "Tr." followed by a page number.

property clerk for safekeeping, and follows through on the case with the prosecutor's office.  (Tr. 245.)

On December 10, 2007, Detective Peralta was assigned to be the arresting officer for a buy and bust operation.  At the beginning of the operation, Detective Peralta and her field team had a tactical plan meeting, at which they discussed potential target locations, received particular assignments, and received radios and a KEL receiver (a one-way transmission device, or "wire," used by an undercover officer, which transmits to a special receiver).  (Tr. 246, 266.)  The "ghost" undercover officer assigned to observe the undercover officer used "ghost wires," a transmission device that looks like an "earphone" and transmits to the rest of the field team using an ordinary radio.  (Tr. 267-268.)  The team planned to go to 1055 Myrtle Avenue, a location right outside the Marcy Houses.  (Tr. 246).

At approximately 4:20 p.m., Detective Peralta and her field team arrived in the vicinity of 1055 Myrtle Avenue.  The team included a primary undercover officer ("undercover") whose job is to attempt to purchase drugs, and a ghost undercover officer ("ghost"), whose job is to track the primary undercover and tell the rest of the team where the undercover is and what

6

he is doing.  Detective Peralta has worked with the undercover, Undercover #2521, on hundreds of prior cases.  (Tr. 263-264.) Detective Peralta was stationed in a parked vehicle, with Sergeant O'Brien, the field team supervisor, and Detective Santiago, near 1055 Myrtle Avenue, in a location from which Detective Peralta could not see the undercover officer or the ghost.  (Tr. 257-258, 264-265.)  Her only knowledge of the activities of the undercover and the ghost came from radio transmissions she received from the ghost.  (Tr. 265.)  The KEL wire worn by the undercover was not transmitting at the time, so Detective Peralta could not hear his interactions.  (Tr. 268-269.)  The transmissions from the KEL and ghost wires are not recorded.  (Tr. 266, 268.)

Detective Peralta received a transmission from the ghost indicating that Undercover #2521 went into the courtyard of 101-103 Nostrand Avenue and approached a black male, "six-one, six-two" and weighing approximately 175 pounds, wearing a black jacket and a black hooded sweatshirt ("hoodie"), with a blue shirt "hanging from underneath the sweatshirt" ("the man in the blue shirt").  (Tr. 247, 275.)  Detective Peralta was aware that Undercover #2521 had bought drugs at 101 Nostrand Avenue in the past.  (Tr. 272.)  The ghost transmitted that Undercover

#2521 was talking to the man in the blue shirt and that Undercover #2521 then went into the lobby of 101 Nostrand Avenue with the man in the blue shirt, a building Detective Peralta described as a six or eight floor residential apartment building inside the Marcy Houses which shares a courtyard with buildings numbered 103, 111, and 113 Nostrand Avenue.  After a couple of minutes, the ghost transmitted that the man in the blue shirt exited 101 Nostrand Avenue and approached a black male, who the ghost described as being "six-two," "stocky," wearing a black leather jacket with brown stitching, a tan hat, a tan hoodie, and brown Timberland boots ("the man in the tan hoodie").  (Tr. 248, 276-278.)

        The ghost then transmitted that the man in the tan hoodie followed the man in the blue shirt into the lobby of 101 Nostrand Avenue, and, a "[c]ouple of seconds later – minutes later," indicated that Undercover #2521 exited the lobby of 101 Nostrand and made a sign indicating that he had successfully bought drugs.  (Tr. 249.)  The ghost indicated that the man in the blue shirt exited 101 Nostrand Avenue and was travelling toward Marcy Avenue and Myrtle Avenue, but that the man in the tan hoodie had not exited 101 Nostrand Avenue.  (Tr. 249, 279.) At around the same time, Undercover #2521 called Detective

8

Peralta's cell phone, reiterated the descriptions of the two
men, and told her to be careful because the man in the tan
hoodie had a gun in his waistband.  (Tr. 249, 258.)  Neither
Detective Peralta nor Sergeant O'Brien made any notes about the
gun.  (Tr. 259.)

        Detective Peralta and Sergeant O'Brien went to the
corner of Marcy Avenue and Myrtle Avenue, approximately a block
away from 101 Nostrand Avenue, where they saw a man fitting the
description of the man in the blue shirt.  (Tr. 250.)  No one
else in the area matched the description, and Detective Peralta
and Sergeant O'Brien detained the man and learned that his name
was Germaine Simmons.  (Tr. 250-251.)  At approximately 4:35
p.m., after Undercover #2521 observed Simmons in custody and
confirmed that he was involved in the buy and bust, Detective
Peralta then placed him under arrest.  (Tr. 251.)  Simmons did
not have in his possession any "buy money" – money used by the
undercover, the serial numbers of which had previously been
recorded by the field team.  (Tr. 280; Tr. 288.)  After
arresting Simmons, Detective Peralta went to the courtyard at
101-103 and 111-113 Nostrand Avenue.  (Tr. 251.)

        When Detective Peralta arrived at the courtyard,
approximately a "minute, minute and a half" later, at

approximately 4:35 p.m., she saw a black male in the courtyard
wearing a black leather jacket with brown stitching, with a tan
hoodie, standing outside 113 Nostrand Avenue.  (Tr. 252, 281.)
She immediately recognized this man's jacket, which matched the
ghost and the undercover's descriptions of the "black leather
jacket, with the stitching," which she described as "very
obvious."  (Tr. 281.)  Detective Peralta later learned that the
man's name was Tyquan Midyett, and at the hearing she identified
defendant Midyett as the man that she observed in the courtyard
with the tan hoodie and black leather jacket with the brown
stitching.  (Tr. 252.)  Midyett was conversing with another
black male at the time.  (Tr. 281.)  Detective Peralta,
accompanied by Sergeant O'Brien and Detective Santiago,
approached Midyett, and Detective Peralta stated, "Police."
(Tr. 252, 282-283.)  Detective Peralta did not have her gun
drawn at the time, and could not recall if her partners had
their guns drawn.  (Tr. 282-283.)  Detective Peralta stated that
113 Nostrand Avenue and 101 Nostrand Avenue are "[r]ight next to
each other."  (Tr. 253.)  No one else in the area wore a black
leather jacket with brown stitching.  (Id.)  Detective Peralta
patted Midyett down and did not find a gun.  (Tr. 284, 286.)
She told Midyett, "You fit a description."  (Tr. 285.)

10

Detective Peralta then detained Midyett in handcuffs.  (Tr. 253, 286.)  Detective Peralta walked Midyett to a place near the sidewalk along Nostrand Avenue and radioed the undercover that "I have an individual that fits the description."  (Tr. 253, 289-291.)  Within a "couple of seconds," the undercover officer drove "very slow" past the area where Detective Peralta stood with Midyett, his car passing by approximately two to three car lengths away, and said "positive" over the radio.  Detective Peralta then placed Midyett under arrest.  (Tr. 254, 289-293.)  Detective Peralta searched all of Midyett's pockets and found no weapons, drugs, or buy money, although she found $3,333 in cash loose in his jacket pocket and three cell phones somewhere in his clothing, which she seized as evidence and vouchered.  (Tr. 255-256, 280, 287-289.)  Detective Peralta, along with Sergeant O'Brien and Detectives Goodman, Samaniego, Dugid, Rodrigo, and Beaudouin, spent approximately 15 minutes looking for the gun in the lobby, garbage, and incinerators in 101, 103, 111, and 113 Nostrand Avenue, but they did not find it and, to Detective Peralta's knowledge, none of the officers made any notes about the search.  (Tr. 254-255, 260.)

        Detective Peralta viewed Gov't Ex. 3500 SP-16 (admitted into evidence without objection) and identified it as

a photograph of Midyett taken on December 10, 2007 by a member
of her field team, fairly and accurately representing how
Midyett appeared at the time she placed him under arrest that
day. (Tr. 256-257.)  The exhibit shows Midyett wearing a black
leather jacket with brown stitching and a tan hoodie.

### 2. *Undercover #2521*

The court credits the testimony of Undercover #2521,
which was consistent with the testimony of Detective Peralta in
all material respects.  Undercover #2521 testified as follows.
Undercover #2521 has worked for the NYPD for approximately five
years, and has worked undercover for four and half years of that
time. (Tr. 300.)  Since May 2005, he has worked for Brooklyn
North Narcotics, purchasing narcotics and investigating
narcotics sales in both long-term and short-term buy and bust
investigations. (Id.)

On December 10, 2007, Undercover #2521 was assigned to
be the primary undercover on a buy and bust operation targeting
the vicinity of 1055 Myrtle Avenue in Brooklyn.  Before going
into the field, Undercover #2521 participated in a tactical
meeting at which his team discussed the locations that would be
targeted, and at which Undercover #2521 received a KEL, a one-

way transmitter, which he tested and determined to be in working order. (Tr. 302-303, 311.)

The buy and bust team arrived in the vicinity of the target location, 1055 Myrtle Avenue, at approximately 4:20 p.m. The two undercovers checked their equipment and radioed their location to their supervisor. At approximately 4:25 p.m., the two undercovers received the "green light" from their supervisor to start the operation. (Tr. 303-304.) Undercover #2521 did not know exactly where the ghost was at the time, although ghosts usually stay close to the primary undercover. (Tr. 308.) Undercover #2521 approached and made eye contact with a man he had never met before, who he later learned to be Simmons, then approached Simmons, said hello, and asked if Simmons knew where he could buy "krills," a street name for crack cocaine. Simmons said yes and told Undercover #2521 to follow him into the lobby of 101 Nostrand Avenue. (Tr. 304-305, 312-315.) Inside the lobby, Undercover #2521 handed Simmons $20 in prerecorded buy money. (Tr. 305, 315-316.) Simmons told Undercover #2521 to wait in the lobby, exited the lobby, went out of sight for a few moments, and then returned with a man wearing a tan hat and tan hoodie, who Undercover #2521 later learned to be Midyett. (Tr. 305-306, 325.) Midyett walked up to Undercover #2521 and handed

13

him three clear plastic vials with yellow caps, each of which contained a white rocky substance, and, according to Undercover #2521, "stated that those were his last three," saying, "That's all I have left." (Tr. 306, 327.) Undercover #2521 noticed what appeared to be the handle of a gun sticking out of Midyett's right jacket pocket. (Id.) When Undercover #2521 looked at the gun handle, Midyett "smirked and said don't worry about that." (Id., 328-329.) Undercover #2521 then left the location approximately 30 seconds after receiving the plastic vials from Midyett, signaled a positive buy, and, when he got a little farther away, stated "positive buy," expecting that the KEL would transmit the statement to his team. (Tr. 306-307, 330.) He did not see Midyett or Simmons leave 101 Nostrand Avenue. (Tr. 331.) He then called Detective Peralta, the arresting officer, with his cell phone just in case the KEL wasn't working, and told her to be careful because he saw a firearm in Midyett's jacket.[3] (Tr. 307, 330-331.) Undercover

---

[3] The only discrepancy of note between the testimony of Detective Peralta and Undercover #2521 is the location of the gun that Undercover #2521 saw on Midyett's person. Detective Peralta testified that Undercover #2521 told her the gun was in Midyett's waistband, while Undercover #2521 testified that he saw the gun in Midyett's jacket pocket and told Detective Peralta that the gun was in the jacket. The court finds that this minor discrepancy does not materially impact the credibility of the two officers. In any case, the discrepancy is irrelevant to whether probable cause existed to arrest Midyett for selling drugs, which is the issue to be decided here.

#2521 also told Detective Peralta the descriptions of the men involved in the transaction.  (Tr. 330.)

Upon returning to his undercover vehicle, Undercover #2521 radioed the descriptions and locations of Simmons and Midyett to the field team.  (Tr. 307.)  He described Simmons as a "[m]ale black, in his twenties, approximately six-two, about 170 pounds, wearing a black jacket, black hoodie and a blue shirt."  (Id.)  He described Midyett as "male black, also in his twenties, approximately six-one, about 220, 230 pounds, wearing a tan hat, tan knit hat, tan hoodie and a black jacket with brown stitching all along the jacket."  (Id.)  Undercover #2521 pointed out defendant Midyett in the courtroom during the hearing and identified him as the man wearing the tan hoodie on December 10, 2007.  (Tr. 307-208.)

After radioing descriptions of Simmons and Midyett to the field team, Undercover #2521 received a radio transmission from Detective Peralta, asking him to identify Simmons.  At approximately 4:35 p.m., Undercover #2521 saw Simmons in Detective Peralta's custody at the corner of Nostrand Avenue and Myrtle Avenue, approximately half a block from 101 Nostrand Avenue.  (Tr. 308-309.)  Then, at approximately 4:40 p.m., Undercover #2521 observed Midyett in custody at the rear of 113

Nostrand Avenue, one set of buildings over from 101 Nostrand

Avenue.  (Tr. 309-310.)  At that time, Midyett no longer had his

tan hat.  (Tr. 310.)  Undercover #2521 was driving his car, and

Midyett was on the sidewalk with members of the team,

approximately two car lengths away, when Undercover #2521 slowly

drove past and identified Midyett as the individual involved in

the undercover buy.  Undercover #2521 radioed the words

"positive identification" to Detective Peralta.  (Tr. 332-335.)


### III. <u>DISCUSSION</u>

Defendant has moved to suppress $3,333 in cash and

three cell phones seized from his person subsequent to his

arrest on December 10, 2007, solely on the basis of defendant's

contention that the police did not have probable cause to arrest

him and that the evidence recovered incident to that arrest must

be suppressed.  For the reasons that follow, the court finds

that the police had probable cause to arrest defendant and

denies the motion to suppress.


**A.   Probable Cause**

The Supreme Court has "repeatedly explained that

'probable cause' to justify an arrest means facts and

circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (citing Gerstein v. Pugh, 420 U.S. 103, 111, (1975); Adams v. Williams, 407 U.S. 143, 148 (1972); Beck v. Ohio, 379 U.S. 89, 91 (1964); Draper v. United States, 358 U.S. 307, 313 (1959); Brinegar v. United States, 338 U.S. 160, 175-76 (1949); and Carroll v. United States, 267 U.S. 132, 162 (1925)); see also United States v. Delossantos, 536 F.3d 155, 158-59 (2d Cir. 2008).  Where police have probable cause to believe an individual has committed or is committing a crime, the police may arrest that individual without a warrant and may, incident to that arrest, search the person of the arrestee and seize evidence found in his possession.  Draper, 358 U.S. at 310-11.

The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," without regard to "the officer's state of mind (except for the facts that he knows)".  Devenpeck v. Alford, 543 U.S. 146, 152-153 (2004) (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003) and Whren

17

v. United States, 517 U.S. 806, 812-13 (1996) (reviewing
cases)).

      In Morales v. Greiner, 381 F.3d 47, 48 (2d Cir. 2004),
the Second Circuit held that probable cause to arrest existed
where an undercover narcotics officer observed the defendant at
a location known to have significant narcotics activity, and saw
him engage in four apparent narcotics sales.  In Morales, the
undercover officer saw four transactions in which the defendant
"'touched hands' with another individual, entered the vestibule
of a building with that person, engaged in some sort of
transaction, and then quickly exited."  Id. at 47.  The
undercover officer also saw one of the apparent buyers holding a
glassine envelope (which the undercover knew to be of a type
used to package drugs) in his hands when he left the vestibule.
Id. at 47-48.  The defendant was arrested 25 minutes after the
last transaction.  Id. at 48.

      Here, Undercover #2521 had far more certain knowledge
that Midyett was engaged in drug sales:  Midyett personally
delivered drugs directly into the hands of Undercover #2521 in
exchange for $20.  There can be no doubt that, at that moment,
Undercover #2521 knew of facts "sufficient to warrant a prudent
person, or one of reasonable caution, in believing, in the

circumstances shown, that the suspect . . . [was] committing . .
. an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).
Therefore, the court finds that Undercover #2521 possessed
probable cause to arrest Midyett when Midyett delivered drugs to
Undercover #2521 in the lobby of 101 Nostrand Avenue at
approximately 4:25 p.m. on December 10, 2007.

### B.    Collective Knowledge Doctrine

The "collective knowledge doctrine" allows the facts
supporting probable cause to be imputed from one officer to
another, and permits the second officer to rely on the validity
of that probable cause in making an arrest.  The doctrine can be
traced to the Supreme Court decision in Whiteley v. Warden, in
which the Court noted that "[c]ertainly police officers called
upon to aid other officers in executing arrest warrants are
entitled to assume that the officers requesting aid offered the
magistrate the information requisite to support an independent
judicial assessment of probable cause."  Whiteley v. Warden, 401
U.S. 560, 568 (1971); see also Illinois v. Andreas, 463 U.S.
765, 772 n.5 (1983) (stating that "where law enforcement
authorities are cooperating in an investigation . . . the
knowledge of one is presumed shared by all").  The doctrine has

been extended to cases in which one officer develops probable
cause for a warrantless arrest and communicates that to the
arresting officer.  See United States v. Colon, 250 F.3d 130,
135 (2d Cir. 2001) (discussing scope of collective knowledge
doctrine).  As long as the officer who requests the arrest
actually knows sufficient facts to support a finding of probable
cause, the arresting officer's reliance on that request will be
proper, and the arrest will be legal.  Whiteley, 401 U.S. at
568; Colon, 250 F.3d at 135-36.

        Here, Detective Peralta arrested Midyett based on a
phone call from Undercover #2521, in which Undercover #2521 told
her that he had bought drugs from Midyett and in which he
described Midyett with specificity and in great detail as a
"male black, . . . in his twenties, approximately six-one, about
220, 230 pounds, wearing a tan hat, tan knit hat, tan hoodie and
a black jacket with brown stitching all along the jacket."  (Tr.
307.)  Detective Peralta testified that she observed Midyett in
the immediate vicinity of the drug sale at approximately 4:35
p.m., within 15 minutes of the time that the buy and bust
operation began, and that Midyett closely matched the
description Undercover #2521 had given her of the drug seller.
(Tr. 252, 281.)  She immediately recognized the "black leather

20

jacket, with the stitching," which she described as "very obvious." (Tr. 281.)

The court fully credits the testimony of Detective Peralta and Undercover #2521. Because the court has already determined that Undercover #2521 had probable cause to arrest Midyett after the transaction in the lobby of 101 Nostrand Avenue, the question here is whether that probable cause was conveyed to Detective Peralta under the collective knowledge doctrine.

The court finds that, pursuant to the collective knowledge doctrine, Undercover #2521 provided Detective Peralta with sufficient information to establish probable cause for Midyett's arrest, including but not limited to the description of the individual who sold drugs to Undercover #2521, and that Midyett in fact matched the given description.[4] Because of the detail in the description given, Detective Peralta had probable cause to arrest Midyett when she first approached him in the vicinity of 113 Nostrand Avenue. The testimony that Undercover #2521 drove past the location and confirmed Midyett's identity before he was arrested, which the court credits, establishes

---

[4]    The description indicated by the officers is corroborated by the photograph of Midyett taken after his arrest, in which the tan hoodie and leather jacket with distinctive brown stitching are easily discernable. (Gov't Ex. 3500 SP-16.)

21

that Detective Peralta had more than ample probable cause to arrest Midyett, and highlights the care with which she effectuated his arrest.[5]

The court therefore rules that there was adequate probable cause for defendant Midyett[6]'s arrest. It was thus proper for Detective Peralta to search defendant incident to that lawful arrest and to seize evidence recovered from his person during that search. Draper, 358 U.S. at 310-11. The court therefore declines to suppress the $3,333 in cash and three cell phones found on defendant's person during his lawful search incident to arrest.

---

[5]    The fact that no gun or buy money was found in Midyett's possession does not vitiate the probable cause for his arrest. The court notes that the hearing testimony established that the field team did not observed Midyett for a period of several minutes after Undercover #2521 completed the buy from Midyett and left the lobby of 101 Nostrand Avenue. The court also notes that Midyett was in the company of another male when arrested, and that male was apparently not stopped or searched. Thus, the jury may weigh those facts at trial. The court finds that the credible police testimony established probable cause for Midyett's arrest, even if the subsequent post-arrest search of his person did not yield the gun or the buy money.

[6]    The defendant argues that the fact that no gun or buy money was found in Midyett's possession vitiates any probable cause for his arrest. The court notes, however, that the hearing testimony established that the field team did not observed Midyett for a period of several minutes after Midyett interacted with the undercover inside the lobby of 101 Nostrand Avenue, and also that Midyett was in the company of another male when arrested, and that male was apparently not stopped or searched. The court finds that the police testimony is credible because it is consistent with a plausible scenario in which Midyett disposed of the gun and money before he was arrested.

## IV.  CONCLUSION

For the foregoing reasons, defendant Midyett's motion to suppress evidence recovered incident to his arrest on December 10, 2007 is denied.

**SO ORDERED**

Dated:     February 6, 2009
           Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge